UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| GETTY PETROLEUM MARKETING INC., | CIVIL ACTION NO. 2:10-cv-01484 |
| Plaintiff, | |
| vs. | Hon. Joseph F. Bianco |
| | Hon. A. Kathleen Tomlinson |
| R.D. CLARK & SONS, INC., ROBERT D. CLARK, JAMES P. CLARK, and JOHN D. CLARK, | |
| Defendants, | |
| R.D. CLARK & SONS, INC., | |
| Third-Party Plaintiff, | |
| vs. | |
| GREEN VALLEY OIL, LLC, and PAUL J. STENDARDI, | |
| | **AFFIDAVIT OF PAUL J. STENDARDI** |
| Third-Party Defendants. | |

PAUL J. STENDARDI, being duly sworn, deposes and says:

1. I am Director of Terminals and Transportation for Getty Petroleum Marketing Inc. ("Getty"). I have been employed by Getty and/or Getty's predecessor since 1988.

2. I respectfully submit this Affidavit in further support of Getty's motion for summary judgment and motion to dismiss.

3. To the extent the facts that I detail here are derived from my own personal knowledge, they are true, and to the extent they are based upon information or documentation supplied to me, I believe them to be true.

4. R.D. Clark & Sons, Inc. ("RDC"), and Robert D. Clark, James P. Clark, and John D. Clark (the "Individual Defendants") (collectively, the "Defendants") make assertions in their memoranda of law in opposition to the motion for summary judgment and motion to dismiss, which I believe are untrue and/or require a response.

5. My responses to such assertions are below.[1]

|     | Page | Defendants' Assertion | My Response |
|-----|------|----------------------|-------------|
| (a) | MSJ at 1. | "In order to be awarded the hauling contract, Getty and Stendardi required RDC to reduce hauling rates in Connecticut by 6 percent, Maine 8 percent, and New York by 14 percent." | Getty did not "require" RDC to reduce its rates. This was a voluntary process whereby Getty sent a Request for Proposal and RDC, along with its competitors, submitted bids in response. After RDC submitted its initial bid, I told RDC that it would lose because its competitors submitted better rates. RDC revised its bid to win the work. |
| (b) | MSJ at 3 see MTD at 3.<br><br>MSJ at 2; see MTD at 20, 24.<br><br>MTD at 23. | "Getty ... hid the fact from RDC that it could renegotiate all rates with the Union."<br><br>"RDC recently learned it could have opted with the Union for a different wage plan, and Union Agreement."<br><br>"RDC never entered into its own labor agreement with the Union. The Memorandum of Agreement is an intent to enter into same." | The Memorandum of Agreement, dated May 24, 2007, which RDC attached as Exhibit D-1 to the Affidavit of Carolyn Viveiros, was not effective because the Union members voted it down. I never told RDC that it could not negotiate with the Union. In fact, RDC did negotiate with the Union -- it signed its own Memorandum of Agreement with the Union on October 5, 2007. |
| (c) | MSJ at 2-3; See MTD at 19.<br><br>MSJ at 3. | "Immediately after assuming Getty's Union drivers, it became obvious that there were numerous side-deals which Getty and Stendardi never mentioned, never disclosed and never told RDC about."<br><br>"Getty and Stendardi knew about the exaggerated trip time | Getty disclosed many additional terms with the Union. Any information that RDC allegedly did not have regarding its dealing with the Union could have been obtained from the Union through the due diligence process. |

---

[1] "MSJ" refers to Defendants' Memorandum of Law in Opposition to the Motion for Summary Judgment. "MTD" refers to the Defendants' Memorandum of Law in Opposition to the Motion to Dismiss.

|     |              |                                                                                                                                                                                                                                                                                                                 |                                                                                                                                                                                                                                                                                                                  |
|-----|--------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|     | MTD at 12.   | standards." <br><br> "It is universally recognized that the oil industry is unique in the number of its hand-shake deals."                                                                                                                                                                                       |                                                                                                                                                                                                                                                                                                                  |
| (d) | MSJ at 3     | "… it appears that GVO and Getty are not acting independently."                                                                                                                                                                                                                                                 | Getty and GVO are separate and unaffiliated entities.                                                                                                                                                                                                                                                            |
|     | MSJ at 4     | "RDC has never seen any writing between Getty and GVO evidencing the partial assignment of the MCC."                                                                                                                                                                                                             | I sent RDC a copy of the Assignment documents on July 24, 2009. Attached hereto as <u>Exhibit 1</u> is a copy of my letter to Carolyn Viveiros enclosing the documents, the fax cover sheet, and the FedEx slip concerning the same.                                                                             |
|     | MSJ at 20.   | "Getty was leasing the stations and thus could never sell the stations. Getty transferred the Operating Agreements to GVO and subleased the stations to GVO…. Obviously, a transfer of an equitable interest in the Customer's right to use the leased station did occur by the assignment and sale by Getty to GVO." | Getty transferred to GVO retail locations it owned or operated, which are recognized explicitly as "Customers" under the MCC. The sale of these Customers gave rise to a partial assignment of the MCC to ensure continued service to these retail locations.                                                    |
| (e) | MSJ at 3-4.  | "In 2008, the same time that RDC was seeking the six month rate increase, Getty unilaterally eliminated Sunday and Holiday premium surcharges at a cost to RDC of $6,247 per week or more than $500,000 over the ensuing 17 month period of the shortened contract."                                             | Getty stopped paying a premium for Sunday and Holiday time because RDC took over its own dispatch. This was part of the agreement between Getty and RDC.                                                                                                                                                         |
| (f) | MSJ at 4     | "In May 2008, Viveiros spoke with Stendardi about reviewing the rates. Getty did absolutely nothing about the six month rate increase."                                                                                                                                                                          | I never spoke with Carolyn or anyone else with GVO regarding the rates in May 2008. The first time I heard that RDC wanted an increase in rates was in early 2009 when Bob Clark said he would park the trucks because he couldn't pay his bills. Bob also sent his letter, dated February 24, 2009. This prompted |

|     |     |     | my trip to Connecticut to review RDC's books and records and to discuss a rate increase. |
| --- | --- | --- | --- |
| (g) | MSJ at 4 | "Getty never responded [to the September 5, 2008 letter], never asked for any financial records or documents, and did not perform or present any evaluation to RDC." | I never received this September 5, 2008 letter and RDC has offered no proof that such letter was sent. I note that the copy of the letter attached as Exhibit D-5 to the Affidavit of Carolyn Viveiros is not signed. This indicates to me that the letter was never signed nor sent, especially in comparison with the letter dated February 24, 2009, which was signed and sent to me. |
| (h) | MTD at 2; *see* MSJ at 4. | "In April 2009, Getty implemented the paltry 4.5% increase. Getty refused to sit down with RDC or perform the mandated audit and evaluation." | RDC requested the 4.5% rate increase in its February 2009 letter. In response to such letter, I traveled to RDC's office in Connecticut and reviewed its books and records. I spoke with RDC about the ways in which it would change its operations to save money. I was satisfied that a 4.5% increase would cover RDC's costs. Getty implemented a 4.5% rate increase as requested. |
| (i) | MSJ at 5 | "In a writing dated October 15, 2009, Exhibits D-9, RDC demanded to be compensated. Getty and GVO did concur in the change of demurrage from $50 to $90 per hour, but later refused to pay some invoices." | Getty never agreed to pay $90 per hour for demurrage. |
| (j) | MSJ at 5 | "Because of closed stations and the loss of volume, Getty agreed to take back three leased Ryder tractors which were no longer needed. But, Getty never took the three leases tractors back." | Getty said it would consider taking back three tractors in the context of resolving the overall dispute between the parties. |
|     | MSJ at 8. | "RDC has requested, but Ryder could not produce any writing which consents to the Sublease [of] the transfer of the tractors from Getty to RDC." | RDC paid the Ryder invoices, and Ryder accepted such payment from RDC. Although Ryder never formally agreed to the Sublease, the actions of Ryder and RDC indicated otherwise. |

| | | | |
|---|---|---|---|
| (k) | MSJ at 6. | Following a November 2009 meeting, "Getty and GVO refused to set a date for a next meeting. They stalled for six weeks until December 16, 2009. In the interim, they were out shopping rates." | Getty received GVO's financial information on November 23, 2009, and Getty responded the next day with questions. Getty did not "stall" the next meeting. The parties had difficulty finding time for the next meeting because of the Thanksgiving holiday and travel schedules of those involved. |
| (l) | MSJ at 14. | "It is denied that the sale of the trailers was on an "as is" basis. RDC has looked for Bills of Sale, but cannot locate same." | RDC purchased the trailers "as is," as indicated in the signed Bill of Sale that is attached hereto as Exhibit 2. Upon information and belief, all of the Bills of Sale for the trailers that RDC purchased had the same language as in Exhibit 2. |
| (m) | MSJ at 15. | "It is agreed that Getty agreed to an installment sale [of the trailers]. The terms of the installment sale are not in a writing signed by RDC." | The 11/26/07 letter that I sent to Bob Clark, which was signed by Bob Clark, included the terms of RDC's purchase of the 17 trailers, which included payment of 6.5% interest. The spreadsheet attached hereto as Exhibit 3 confirms the terms of this agreement and, as indicated, 6.5% interest was charged in arriving at the monthly payments due. When RDC asked Getty to take back 4 trailers, and Getty agreed, this written contract was modified in that the number of trailers was reduced. As a result, the purchase price and corresponding monthly payment (that still included 6.5% interest) was reduced. |
| (n) | MTD at 17. | "… the Union drivers will soon be without a home." | Getty outsourced its trucking business. Upon information and belief, most of the drivers found employment with the companies Getty retained. |

6. Any failure to address other assertions in the Defendants' memoranda of law and/or supporting papers is not an indication that I agree with the same.

5

7. Attached hereto as Exhibit 4 is a redacted copy of the Site and Facilities Sublease, without exhibits, which is one of the "assignment documents" concerning Getty's partial assignment of the MCC to GVO.

8. As I indicated in my prior Affidavit, dated August 18, 2010, in order to avoid default, Getty paid Ryder for several invoices for which RDC was liable pursuant to the Tractor Sublease. Getty made such payments to Ryder because Getty understood that the Tractor Sublease was in full force and effect and, therefore, Getty could recover this amount from RDC.

9. Upon information and belief, RDC paid Ryder over $800,00 over the course of approximately two years in accordance with the Tractor Sublease.

_____
Paul Stendardi

Sworn to before me this
12th day of October 2010.

_____
Notary Public

ROXANNE LOHN-CURY
Notary Public, State of New York
No. 01LO4708913
Qualified in Queens County
Commission Expires March 30, 20 14